(No. 58791—

JOANNE JENKINS *et al.*, Appellees, v. DELON WU *et al.* (Thomas F. Tobin *et al.*, Appellants).

*Opinion filed May 25, 1984.—Rehearing denied September 28, 1984.*

SIMON, J., took no part.

Baker & McKenzie, of Chicago (Francis D. Morrissey, John T. Coleman, John T. Rank and Michael A. Pollard, of Chicago, and James J. Costello and Donald A. Henss, of Urbana, of counsel), for appellants.

James K. Toohey and David C. Bohrer, of Ross & Hardies, of Chicago, for appellees.

Robert J. Burdett, Jr., and Daniel J. Mulvanny, of Naperville, and Harry L. Kinser, of Chicago, for *amicus curiae* Illinois Hospital Association.

Friedman & Koven, of Chicago (John B. Simon, Russ M. Strobel and Brad L. Jansen, of counsel), for *amicus curiae* Illinois State Medical Society.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, and Jerold T. Nelson, of Chicago (D. Kendall Griffith, John G. Langhenry, William R. Kucera, and Michael R. Callahan, of counsel), for *amicus curiae* Chicago Hospital Council.

Richard M. Daley, State's Attorney, of Chicago (Jane Clark Casey, Deputy State's Attorney, and Raymond J. Prosser, Assistant State's Attorney, of counsel), for *amicus curiae* County of Cook.

Cassiday, Schade & Gloor, of Chicago (Rudolph G. Schade, Jr., Kevin G. Burke and John P. Stansbury, of counsel), for *amicus curiae* Evangelical Hospitals Corporation.

Schuyler, Roche & Zwirner, of Chicago (Daniel M. Schuyler, Bruce K. Roberts and Eleanor R. Wagner, of counsel), for *amicus curiae* Joint Commission on Accreditation of Hospitals.

George M. Elsener and David A. Novoselsky, of Chicago (George M. Elsener, David A. Novoselsky, Robert A. Holstein, Patrick A. Tuite and Michael I. Starkman, of counsel), for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE MORAN delivered the opinion of the court:

Plaintiff, Joanne Jenkins, filed a medical malpractice action in the circuit court of Cook County. Her husband, Roosevelt Jenkins, is also a named plaintiff. He alleges loss of consortium. The cause of action arose during the course of Mrs. Jenkins' treatment at the University of Illinois Medical Center. The defendants to the action are numerous physicians, nurses, and hospital support personnel connected with the University's Medical Center.

During the discovery process, plaintiffs served a subpoena for deposition upon the University of Illinois Medi-

cal Center's board of trustees and its executive director, Lester Rudy (respondents). Neither respondent is a party to the plaintiffs' malpractice action. Attached to the subpoena there was a five-page request for production of certain documents and records. It is undisputed that plaintiff has received her own medical records without any objections. Other documents requested were also supplied to the plaintiffs, with the exception of requests numbered three, six, and, in part, seven. Briefly, in paragraph three of the attachment to subpoena, plaintiffs requested the hospital's entire file or files relating to its accreditation for the year 1978. In paragraph six, plaintiff sought the personnel file of Dr. Cubria, a party defendant, and all reports of medical review panels, however denominated, regarding patient care provided by Dr. Cubria during 1978. This request also sought all reports or other evidence of complaints or commendations relative to the quality of health care provided by Dr. Cubria. Paragraph seven requested all reports of medical review panels, notes of all lectures given in which plaintiff's case was discussed, and all photographs, slides, or movies taken of plaintiff. This last request required a general search of all hospital files, including medical review committee files. The respondents claimed privilege for all the documents falling within requests three and six based on section 8—2101 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 8—2101 *et seq.;* hereinafter referred to as the Act), and for the documents falling within request seven, to the extent that the request sought information relating to the treatment of Mrs. Jenkins as found in review committee or investigative files.

Following the board's refusal to furnish all of the information requested, the plaintiffs filed a motion to compel production of the documents withheld. In response to the motion, respondents made available to the trial

court, for *in camera* inspection, the documents which it claimed were privileged under the Act. At a hearing on April 11, 1983, following the court's inspection, the trial judge acknowledged that nothing in any of the documents mentioned the plaintiff or anything dealing with the care that she received. Nevertheless, the court found that the documents could lead to the discovery of admissible evidence and were, therefore, discoverable absent the statutory privilege. Moreover, the court declared the Act invalid. It found that the provision of the statute which denied medical malpractice plaintiffs equal access to documents that would be available to physicians in other proceedings constituted a denial of equal protection. Therefore, it ordered that the documents be produced.

Respondents subsequently petitioned the trial court to vacate its order and also requested that production of the documents be stayed until such time as the court made its decision on their motion to vacate. The court allowed this request and returned the documents, previously produced for *in camera* inspection. Respondents further requested an extension of the briefing schedule in order to present experts' testimony regarding the need for confidentiality in the evaluation and accreditation process. However, the court denied this request.

On June 22, 1983, after arguments, the trial court denied the motion to vacate and ordered the respondents to produce the documents which they had previously claimed to be privileged. At this time, the court questioned the reasoning behind the statute, stating:

> "I see no rationale for denying a medical malpractice plaintiff access to the data which can be obtained by a physician whose staff privileges are under attack ***. The exception is what I am concerned about."

After expressing his concerns in the form of an oral ruling, the trial judge informed both sides of his inten-

tion to write a memorandum opinion explaining the basis for his ruling. The matter was then continued until the next day to ascertain whether the respondents would comply with the court's order.

On June 23, 1983, Thomas F. Tobin, attorney for the respondents, appeared before the trial judge and stated that he was in possession of the records and that he would not produce them. As a result, he was held in contempt of court and fined one dollar. Further proceedings were stayed by the trial court pending final determination by a court of review.

On October 18, 1983, the court filed its memorandum of decision which explained the basis for its earlier ruling. The court held the Act invalid under section 13 of article IV of the Illinois Constitution. More specifically, it stated:

> "The issue of proper health care being provided according to the accepted community standards is the same in medical malpractice plaintiff's actions against their physicians and in hospital proceedings to decide upon a physician's staff privileges. The two classes are therefore similarly situated, and by virtue of the plaintiff being barred from this data and the exempted physician being afforded the opportunity to obtain it, plaintiff is arbitrarily and unreasonably discriminated against."

Respondents and counsel appeal from the orders of the circuit court holding the Act unconstitutional and holding Tobin in contempt of court. This court allowed direct appeal under Rule 302(a)(1) (87 Ill. 2d R. 302(a)(1)). Numerous *amici curiae* briefs have also been filed.

Two issues are raised. They are (1) whether section 8—2101 violates the equal protection clauses of both the United States and Illinois constitutions, and (2) whether section 8—2101 constitutes special legislation in violation of article IV, section 13, of the Illinois Constitution.

Section 8—2101 provides:

"All information, interviews, reports, statements, memoranda or other data of the Illinois Department of Public Health, Illinois State Medical Society, allied medical societies, physician-owned inter-insurance exchanges and their agents, or committees of accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care, shall be privileged, strictly confidential and shall be used only for medical research, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges, *except that in any hospital proceeding to decide upon a physician's staff privileges, or in any judicial review thereof, the claim of confidentiality shall not be invoked to deny such physician access to or use of data upon which such a decision was based.*" (Emphasis added.) Ill. Rev. Stat. 1983, ch. 110, par. 8—2101.

Section 8—2102 of the statute reads:

"Such information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, *nor discoverable* in any action of any kind in any court or before any tribunal, board, agency or person." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 110, par. 8—2102.

All parties apparently agree that, as a result of this legislation, medical malpractice plaintiffs are denied access to information that would be available to physicians whose staff privileges were either limited or revoked. The trial court initially perceived this disparity in treatment to be a violation of both the Federal and State equal protection clauses. However, in the court's written memorandum, its holding was based on the special legislation clause of the Illinois Constitution. For the reasons

that follow, we believe the trial court erred in its analysis of both issues.

The fourteenth amendment to the Federal Constitution requires equality between groups of persons "similarly situated." It does not deny a State the power to treat different classes of persons differently. (*Eisenstadt v. Baird* (1972), 405 U.S. 438, 446-47, 31 L. Ed. 2d 349, 358, 92 S. Ct. 1029, 1034-35; *People v. Mathey* (1983), 99 Ill. 2d 292, 296; *People v. Bradley* (1980), 79 Ill. 2d 410, 416.) In fact, in the absence of a fundamental right or suspect classification, the legislature may even differentiate between persons similarly situated if there is a rational basis for doing so. (*Massachusetts Board of Retirement v. Murgia* (1976), 427 U.S. 307, 312-13, 49 L. Ed. 2d 520, 524, 96 S. Ct. 2562, 2566-67; *People ex rel. Difanis v. Barr* (1980), 83 Ill. 2d 191, 204; *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 578.) This is the traditional equal protection analysis that has been used by this court in assessing both Federal and State equal protection challenges. (*Illinois Housing Development Authority v. Van Meter* (1980), 82 Ill. 2d 116, 121; *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 578; *S. Bloom, Inc. v. Mahin* (1975), 61 Ill. 2d 70, 76.) Under this analysis, " '[a] classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." ' " *Eisenstadt v. Baird* (1972), 405 U.S. 438, 447, 31 L. Ed. 2d 349, 359, 92 S. Ct. 1029, 1035, citing *F. S. Royster Guano Co. v. Virginia* (1920), 253 U.S. 412, 415, 64 L. Ed. 989, 990, 40 S. Ct. 560, 561-62.

This court has also applied the equal protection analysis, articulated above, in reviewing a statute challenged under the special legislation provision of the Illinois Constitution. (*People v. Gurell* (1983), 98 Ill. 2d 194, 206; *Il-*

linois Housing Development Authority v. Van Meter (1980), 82 Ill. 2d 116, 124; Anderson v. Wagner (1979), 79 Ill. 2d 295, 315; S. Bloom, Inc. v. Mahin (1975), 61 Ill. 2d 70, 77.) The reasons underlying the similar treatment of equal protection and special legislation in Illinois were discussed extensively in Anderson and, therefore, need not be repeated here.

In Illinois Polygraph Society v. Pellicano (1980), 83 Ill. 2d 130, the following definition of special legislation was stated by the court:

> "Special legislation confers a special benefit or exclusive privilege on a person or a group of persons to the exclusion of others similarly situated. [Citation.] It arbitrarily, and without a sound, reasonable basis, discriminates in favor of a select group." (Emphasis in original.) 83 Ill. 2d 130, 137-38.

The language of Pellicano, and that used in the equal protection classification test outlined above, illustrates the similarity that exists between these two concepts. For just as in the equal protection analysis, review of a classification challenged under the special legislation clause requires a determination of whether there is some real difference, between those classified, that rationally explains the different treatment accorded to them.

In the instant case, the trial court found medical malpractice plaintiffs and physicians seeking to defend their staff privileges to be similarly situated. Further, the court stated that there was no sound reasonable basis for such an arbitrary distinction. We disagree.

Under section 8—2101, a physician can gain access to review committee information only in the limited circumstance of a "hospital proceeding to decide upon a physician's staff privileges, or in any judicial review thereof ***." (Ill. Rev. Stat. 1983, ch. 110, par. 8—2101.) This exception was perceived by the legislature to be necessary in order to protect the due process rights of physi-

cians. During floor debates on the 1976 amendments to the Act, Representative James Houlihan stated: "The purpose of this Amendment here is to provide elementary due process for such a physician in his concern, of course, for his staff privileges." (Floor Debate, 79th Gen. Assembly, House, June 10, 1976, at 16.) Contrary to the trial court's assertion, the issue in a due process challenge to revocation of staff privileges is not the same as the issue in a medical malpractice action. When a violation of due process is alleged, the inquiry centers on the fundamental fairness of the proceedings. Thus, information concerning the committee meeting becomes essential to the physician's claim. Further, if a physician were denied information relating to the reason for his dismissal, he would be unable to challenge an adverse decision. In recognition of the physician's need for this information, the legislature drafted this exception. Indeed, if the legislature had not so provided, the statute's validity might well be questioned under the due process clause.

Plaintiffs claim that the statute is one-sided. However, the Act provides for the discovery of the patient's own records which are the source of her claim. In the instant case, it is undisputed that plaintiff has received her own records. Additionally, not only do medical malpractice plaintiffs have full and complete access to their own records, but they can also depose all persons involved in their treatment and engage experts to give opinions as to the quality of care received. Therefore, the denial of this information to such plaintiffs should have little impact on their ability to maintain their cause of action. See *Memorial Hospital v. Shadur* (7th Cir. 1981), 664 F.2d 1058, 1062; *Good Samaritan Hospital Association, Inc. v. Simon* (Fla. App. 1979), 370 So. 2d 1174, 1176.

Moreover, the purpose of this legislation is not to facilitate the prosecution of malpractice cases. Rather, its

purpose is to ensure the effectiveness of professional self-evaluation, by members of the medical profession, in the interest of improving the quality of health care. The Act is premised on the belief that, absent the statutory peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues. Plaintiffs contend that, even without the privilege, physicians would take the steps necessary to protect the long-term reputation of their profession and their hospitals.

An understanding of the conflicting interests involved in peer review is helpful in assessing the parties' contentions. As stated by one commentator:

> "Doctors are motivated to engage in strict peer review by the desire to maintain the patient's well-being and to establish a highly respected name for both the hospital and the practitioner within the public and professional communities. However, doctors seem to be reluctant to engage in strict peer review due to a number of apprehensions: loss of referrals, respect, and friends, possible retaliations, vulnerability to torts, and fear of malpractice actions in which the records of the peer review proceedings might be used." Note, *Medical Peer Review Protection in the Health Care Industry,* 52 Temple L.Q. 552, 558 (1979).

The legislature considered these fears in amending section 8—2101. As Senator Robert Egan stated in describing the statute during floor debates on the 1977 amendments to the Act: "[I]t restricts the . . . the liability [of] persons serving on committees in hospitals for the . . . for the reason that apparently the malpractice crisis has frightened so many people from doing anything other than that which they particularly must do in the . . . in the practice that there . . . its hard to get people to serve on committees." Floor Debate, 80th Gen. Assembly, Senate, May 27, 1977, at 62-63.

The problem of obtaining qualified physicians to par-

ticipate in peer review is not unique to Illinois. In fact, the majority of State legislatures have passed legislation in the area of hospital-committee confidentiality in an attempt to encourage the self-evaluation of physicians. Moreover, at least nine of these State statutes contain exceptions which allow physicians access to otherwise confidential information when defending their staff privileges. In that respect, they are similar to the legislation in question. The nine States are: Alaska (Alaska Stat. sec. 18.23.030 (1981)); Arizona (Ariz. Rev. Stat. Ann. sec. 36—445.01A (1983 Supp.)); California (Cal. [Evid.] Code sec. 1157 (1984 Supp.)); Colorado (Colo. Rev. Stat. sec. 12—43.5—102(3)(e) (1978)); Hawaii (Hawaii Rev. Stat. sec. 624—25.5 (1983 Supp.)); Indiana (Indiana Code Ann. sec. 34—4—12.6—2(b) (1983 Supp.)); Kentucky (Ky. Rev. Stat. Ann. sec. 311.377(6) (1983)); Oregon (Or. Rev. Stat. sec. 41 675(5) (1984)); and Washington (Wash. Rev. Code Ann. sec. 4.24.250 (West 1983 Supp.)).

In the leading case of *Bredice v. Doctors Hospital, Inc.* (D.D.C. 1970), 50 F.R.D. 249, *aff'd* (D.C. Cir. 1973), 479 F.2d 920, the court recognized the need for confidentiality in effective peer review, even in the absence of statutory authority. In *Bredice,* a medical malpractice plaintiff sought production of committee proceedings relating to the death of plaintiff's decedent. In holding that such proceedings were entitled to a qualified privilege on the basis of public policy, the court stated:

> "Confidentiality is essential to effective functioning of these staff meetings; and these meetings are essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care. To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations. Constructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used

as a denunciation of a colleague's conduct in a malpractice suit." 50 F.R.D. 249, 250.

It is evident from the floor debates discussing the 1976 amendments to the Act that the House of Representatives also believed that confidentiality would foster peer review and consequently improve health care within the State. As former Representative Harold Washington stated:

"[The legislature] wanted to give protection to the various health providers in the state with the focus upon the medical profession and doctors. And also, to better supervise the health providers in a hope that we could increase or improve not only the quality of care, but lower the cost of medical health care in the state." Floor Debate, 79th Gen. Assembly, House, June 11, 1976, at 17.

From the foregoing, it is apparent that the Act represents an attempt by the Illinois legislature to promote quality health care by encouraging physicians to police themselves. This purpose would definitely be thwarted if, as the plaintiff contends, these reports were discoverable in medical malpractice cases. Conversely, the narrow exception provided for physicians is necessary and does not undermine the Act's stated purposes. We find, therefore, that the classification of physicians and medical malpractice plaintiffs in section 8—2101 of the Act is rationally related to the State's legitimate interest of improving health care through confidential peer review. As such, the statute offends neither the State nor Federal equal protection clause. (See *Dandridge v. Williams* (1970), 397 U.S. 471, 485, 25 L. Ed. 2d 491, 501-02, 90 S. Ct. 1153, 1161.) Further, since the exemption in the Act represents an attempt by the legislature to safeguard the physician's right to due process, a right enjoyed by all, we also find that the characterization of this legislation as "special" was error.

During oral argument, plaintiffs' counsel argued for

the first time that the language of the Act was so broad that the statute's proper application could never be assured. Although this point was raised in the introduction and conclusion of plaintiffs' brief, it was never mentioned in the body of the argument. Therefore, the issue is waived under our Rules 341(e)(7) and (f) (87 Ill. 2d Rules 341(e)(7), (f)). (See also *People v. Godinez* (1982), 91 Ill. 2d 47, 57.) Consequently, we need not address it.

Additionally, two motions were taken under advisement with the case. They were plaintiffs' motion to supplement the record on appeal and plaintiffs' motion to strike the brief of Evangelical Hospitals Corporation. For the following reasons, the plaintiffs' motion to supplement the record on appeal is denied, whereas, the motion to strike the brief is granted, in part.

This court has held that matters not properly in the record will not be considered on review. (*Gille v. Winnebago County Housing Authority* (1970), 44 Ill. 2d 419, 427; *Department of Public Works & Buildings v. Bloomer* (1963), 28 Ill. 2d 267, 275.) Our Rules 321 and 323 (87 Ill. 2d Rules 321, 323) provide for the content of the record on appeal. Rule 329 (87 Ill. 2d R. 329) sets forth the means by which the record on appeal may be amended. That rule states, "Material omissions or inaccuracies or improper authentication may be corrected by stipulation of the parties or by the trial court, either before or after the record is transmitted to the reviewing court ***." The rule also states that "[i]f the record is insufficient to present fully and fairly the questions involved, the requisite portions may be supplied at the cost of appellant. If necessary, a supplemental record may be certified and transmitted."

In the present case, plaintiffs seek to supplement the record with the deposition of Dr. Wu, one of the defendants herein. Plaintiffs' purpose in supplementing the record is to buttress their argument concerning the Act's

broad language. Having found this issue to be waived, Dr. Wu's deposition has no bearing on the issues addressed in this appeal. Therefore, under Rule 329, the material sought to be supplemented is not necessary to fully and fairly present the questions involved. Further, the material sought to be added to the record cannot be characterized as an "omission" under Rule 329 since the deposition in question was not even in existence at the time the trial court entered its order which held the Act unconstitutional. The deposition occurred more than five months later. It should also be noted that Dr. Wu is not a party to the instant appeal and has not had a chance to respond to plaintiffs' motion. In fact, the trial court's order, that the record be supplemented, was entered the day before this court heard oral argument. At that time, all of the briefing had been completed. To allow the record to be supplemented in such a manner would also result in prejudice to the respondents. The plaintiffs' motion to supplement the record is, thus, denied.

Finally, plaintiffs wish to strike the *amicus curiae* brief of Evangelical Hospitals Corporation. They claim that the brief has attempted to present material that was expressly rejected by the trial court. Plaintiffs are referring to the inclusion of certain affidavits in the appendix of the brief. In these affidavits, five physicians attest to the need for confidentiality in effective peer review. This is, essentially, the same type of expert testimony that the respondents attempted to introduce in the trial court. Since the court below rejected respondents' offer of proof, the inclusion of this testimony in the appendix of the brief was improper. These affidavits were not filed in the trial court and are not a part of the record on appeal. Therefore, they cannot be considered by this court. (*Kazubowski v. Kazubowski* (1970), 45 Ill. 2d 405, 415, *cert. denied* (1970), 400 U.S. 926, 27 L. Ed. 2d 186, 91 S. Ct. 188.) Likewise, the inclusion of by-laws

from various hospitals was also improper. However, since all the objectionable material was contained in the appendix, we see no reason to strike the entire brief. The plaintiffs' motion to strike is therefore granted, in part. The appendix of the brief submitted by Evangelical Hospitals Corporation is stricken.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

*Judgment reversed.*

JUSTICE SIMON took no part in the consideration or decision of this case.